UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OPPENHEIMER & CO. INC., <br><br> Plaintiff, <br><br> - against - <br><br> DOCULYNX, INC., as successor-in-interest to ANACOMP, INC., <br><br> Defendant. | Case No.: <br><br> **COMPLAINT** |

Oppenheimer & Co. Inc. ("Oppenheimer") by and through its attorneys, Satterlee Stephens LLP, as and for its Complaint against Defendant DocuLynx, Inc., as successor-in-interest to Anacomp, Inc. ("DocuLynx"), alleges as follows:

### PRELIMINARY STATEMENT

1. This action arises out of DocuLynx's material breach of a September 15, 2017 Settlement Agreement (the "Settlement Agreement") entered into between Oppenheimer and DocuLynx which resolved a prior litigation between the parties before this Court titled, *Oppenheimer & Co. Inc. v. DocuLynx, Inc., as successor-in-interest to Anacomp, Inc.*, Case No.: 17-CV-05940 (SHS) (the "Underlying Action").

2. The Underlying Action was commenced by Oppenheimer as a result of DocuLynx's breach of its written agreements with Oppenheimer as set forth more fully below.

3. In resolving the Underlying Action, the Settlement Agreement required DocuLynx, among other things, to secure a performance bond which provides that in the event that DocuLynx cease providing services to Oppenheimer for any reason, Oppenheimer would immediately be entitled to a prorated refund of any annual payment made to DocuLynx by Oppenheimer under the Settlement Agreement.

1

4. As set forth below, DocuLynx has materially breached the Settlement Agreement by, among other things, failing to obtain the required performance bond. As expressly provided within the Settlement Agreement, DocuLynx's breach has already caused and will continue to cause Oppenheimer to suffer irreparable harm.

## PARTIES

5. Plaintiff Oppenheimer is a corporation organized and existing pursuant to the laws of the State of New York and maintains its principal place of business at 85 Broad Street, New York, New York 10004.

6. Upon information and belief, Defendant DocuLynx is a corporation organized and existing pursuant to the laws of the State of Nebraska and maintains its principal place of business at 6916 N. 97th Circle, Omaha, Nebraska 68122.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over Defendant DocuLynx pursuant to 28 U.S.C. § 1332.

8. This Court also has jurisdiction over Defendant DocuLynx pursuant to the terms of the Settlement Agreement, which provides in pertinent part, "Any action brought to enforce the terms of this Settlement Agreement shall be brought exclusively before the state or federal courts located within the State of New York and the Parties hereby consent to the jurisdiction of the same."

9. Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) and pursuant to the terms of the Settlement Agreement as outlined above.

## BACKGROUND

### Oppenheimer's Relationship with DocuLynx

10.     Oppenheimer is a Securities and Exchange Commission ("SEC") and Financial Industry Regulatory Authority, Inc. ("FINRA") regulated broker/dealer. As such, Oppenheimer is subject to regulations regarding the preservation of confidential documents regarding Oppenheimer's customers, including, but not limited to, SEC Rule 17a-4.

11.     Defendant DocuLynx is a data imaging vendor that serves as an information management, information governance, and records management solutions provider.

12.     In or about December of 2000, Oppenheimer began utilizing DocuLynx (through its predecessor, Anacomp, Inc. ("Anacomp")) as its data imaging vendor. Under the parties' agreement, Oppenheimer would deliver certain confidential records regarding Oppenheimer's customers (the "Oppenheimer Property") to Anacomp (and subsequently DocuLynx), which would in turn image the hardcopy documents and store the resulting data.

13.     On or about December 4, 2000, Oppenheimer and Anacomp entered into a Master Agreement for Data Imaging Service (the "Master Agreement").[1] A copy of the Master Agreement is annexed hereto as Exhibit A.

14.     The Master Agreement provided that Anacomp would be the exclusive data imaging provider for Oppenheimer during the contract term. *See* Master Agreement, Exhibit A annexed hereto at ¶ 1.

15.     The Master Agreement also contained a "Confidentiality" section which provided that:

> Anacomp will utilize commercially reasonable efforts in safeguarding [Oppenheimer's] information and data. Anacomp

---

[1]     The Master Agreement was entered into by Oppenheimer's predecessor, Fahnestock & Company, Inc.

3

2777047_1

> agrees not to divulge or disclose to third parties, or make any use whatsoever, of [Oppenheimer's] information and data provided to Anacomp unless required by law. Anacomp shall be liable to [Oppenheimer] for a negligent or willful breach of the foregoing obligation.

*Id.* at ¶ 6.

16. The Master Agreement also contained a "Default" section which provided that:

> If either party is in material default under this Agreement and such default continues for thirty (30) days after written notice thereof by the other party, then this Agreement may thereupon be terminated by such other party; provided however, that if [Oppenheimer] fails to pay any amount promptly when due, Anacomp…may at its election and without notice: (i) terminate this Agreement; (ii) suspend performance of this Agreement until the invoice is paid; and/or (iii) declare any unpaid balances immediately due.

*Id.* at ¶ 9.

17. Notably, nothing in the "Default" section of the Master Agreement, or any other section of the Master Agreement, or any other written agreement between the parties (including the subsequent Settlement Agreement) authorizes DocuLynx to refuse to return Oppenheimer Property upon demand from Oppenheimer. Quite the opposite, DocuLynx's subsequent agreement with Oppenheimer expressly provides that in the event of a termination, DocuLynx will unconditionally return all Oppenheimer Property.

18. In August 2010, Oppenheimer and Anacomp entered into an "Amendment to Master Agreement for Data Imaging Services" (the "Amended Agreement"). A copy of the Amended Agreement is annexed hereto as Exhibit B.

19. The Amended Agreement provided that the term of the parties' Master Agreement (which previously had been renewed on an annual basis) would terminate on July 31, 2011. *See* Amended Agreement, Exhibit B annexed hereto.

2777047_1

20. The Amended Agreement also clearly provided that:

> Upon any termination whatsoever, the Company shall terminate the provision of any products and/or services ***and return all images, data and reports that were provided pursuant to the [Master Agreement] to [Oppenheimer] without any "deconversion fees" (as such concept is commonly understood) or liability of any kind.***

*See* Amended Agreement, Exhibit B annexed hereto (emphasis added).

21. Following the expiration of the Amended Agreement on July 1, 2011, DocuLynx continued to provide services under the Master Agreement and the Amended Agreement to Oppenheimer on a month-to-month basis. To this end, DocuLynx invoiced Oppenheimer for services on a monthly basis and Oppenheimer paid said invoices.

22. The month-to-month provision of services by DocuLynx and payment of invoices by Oppenheimer continued without objection by either party until in or about the Spring of 2017, when DocuLynx advised Oppenheimer that it desired to change its pricing arrangement with Oppenheimer (under which the parties had operated for over seventeen years). To this end, DocuLynx offered Oppenheimer a proposal which provided for services under an annual license fee of $806,000. Oppenheimer declined the DocuLynx proposal, and DocuLynx continued to provide services to Oppenheimer through the Spring and into the Summer of 2017 at the previously agreed fee.

23. On July 27, 2017, Jim McDonald, DocuLynx's Senior Vice President of Professional Services, sent an email to Oppenheimer taking the position that the parties' agreement had terminated effective July 1, 2017, and that if Oppenheimer desired to proceed on an annual license basis, the cost would be $806,000 annually. Mr. McDonald further warned that, absent payment in the sum of $806,000 (for a prospective 1 year license) by August 4, 2017, Oppenheimer's access to the software may be suspended.

24.  Oppenheimer responded to Mr. McDonald's email and advised DocuLynx that Oppenheimer did not intend to renew its agreement under the terms proposed by DocuLynx. Oppenheimer further reminded DocuLynx of the provision within the Amended Agreement whereby DocuLynx was required to return all Oppenheimer Property, upon termination of the agreement.

25.  Over the next several days, Oppenheimer, on multiple occasions, demanded that DocuLynx immediately return all Oppenheimer Property, as it was expressly obligated to do under the Amended Agreement. Indeed, during one such telephone call between Oppenheimer and DocuLynx, Mr. McDonald acknowledged DocuLynx's obligation to immediately return the Oppenheimer Property.

26.  Despite the above referenced communications and acknowledgment by DocuLynx, DocuLynx refused to return Oppenheimer's Property. Even more egregious, DocuLynx openly and in writing attempted to blackmail Oppenheimer into entering into a new lucrative contract with DocuLynx by utilizing the Oppenheimer Property which it is holding hostage, as well as the potential regulatory ramifications which Oppenheimer faces as a result of DocuLynx refusal to return the Oppenheimer Property, as leverage

**The Underlying Action**

27.  As a result of the above described conduct by DocuLynx in breach of its agreements with Oppenheimer, Oppenheimer was forced to commence the Underlying Action. The Underlying Action was commenced by Oppenheimer in the Supreme Court of the State of New York, County of New York. Subsequently, DocuLynx removed the Underlying Action to the United States District Court for the Southern District of New York. A copy of the Complaint in the Underlying Action is annexed hereto as Exhibit C.

28.     In short, the Underlying Complaint alleged that DocuLynx had breached its agreements with Oppenheimer by refusing to return the Oppenheimer Property, which the agreements unequivocally provided that Oppenheimer was entitled to.

29.     Subsequent to filing its Complaint in the Underlying Action, Oppenheimer moved the Court for a Temporary Restraining Order and Preliminary Injunction, directing, among other things, that DocuLynx immediately return the Oppenheimer Property.

30.     Throughout the litigation of the Underlying Action, DocuLynx never once disputed that the Oppenheimer Property belonged exclusively to Oppenheimer or that Oppenheimer was entitled to the return of its Property.

**The Settlement Agreement**

31.     On September 15, 2017, prior to argument on Oppenheimer's motion for a Preliminary Injunction, the parties resolved the Underlying Action. A copy of the Settlement Agreement is annexed hereto as Exhibit D.

32.     Within the Settlement Agreement, DocuLynx acknowledged that Oppenheimer had no obligation to make any payment to DocuLynx other than the payments referenced within the Settlement Agreement, including, but not limited to, the sums of money which DocuLynx had attempted to extort from Oppenheimer by refusing to return the Oppenheimer Property. *See* Settlement Agreement, Exhibit D annexed hereto at ¶ 2.

33.     The Settlement Agreement also provided that DocuLynx would continue providing certain services to Oppenheimer over a period of seven (7) years following the execution of the Settlement Agreement. Specifically, while Oppenheimer would cease providing new data to DocuLynx for imaging, DocuLynx would continue to store the Oppenheimer Property currently in its possession for a period of seven (7) years (as required by applicable

regulation) and grant Oppenheimer a license to utilize DocuLynx's software in order to have access to the Oppenheimer Property. *Id.* at ¶ 3-6. In other words, DocuLynx would continue to provide the same storage services and software license that it provided to Oppenheimer over the past 17 years, but would not be required to accept new data from Oppenheimer for imaging and storage.

34. With regard to the Oppenheimer Property (referred to in the agreement as the "Oppenheimer Data"), the Settlement Agreement provides:

> DocuLynx acknowledges that the Oppenheimer Data belongs solely to Oppenheimer and that DocuLynx has no ownership interest in the Oppenheimer Data or right to possess the Oppenheimer Data, other than for the purposes of providing the above described services to Oppenheimer.

*Id.* at ¶ 7.

35. In exchange for storing the Oppenheimer Property for a period of seven (7) years, as well as the license to the software, Oppenheimer agreed to pay DocuLynx the total sum of $1,386,000.00 in seven (7) annual installments of $198,000.00 (each an "Annual Installment"). *Id.* at ¶ 13-14.

36. However, prior to being entitled to receive any Annual Installment, the Settlement Agreement provides that DocuLynx was required to comply with two separate and distinct conditions precedent.

37. First, the Settlement Agreement required DocuLynx to deposit the Oppenheimer Property (*i.e.* the Oppenheimer Data) with a third-party escrow agent (the "Escrow Agent") at the sole cost of DocuLynx. *Id.* at ¶ 8-9.

38. The purpose of the Escrow Agent was to ensure that, in the event that DocuLynx should cease providing services to Oppenheimer under the Settlement Agreement, Oppenheimer

would immediately be able to recover the Oppenheimer Property. In other words, the Escrow Agent would ensure that the circumstances which gave rise to the Underlying Action would not occur yet again. To this end, the Settlement Agreement provides:

> DocuLynx acknowledges that, in the event that DocuLynx and the escrow agent shall cease providing services to Oppenheimer, Oppenheimer shall immediately be entitled to the return of the Oppenheimer Data from the Escrow Agent in the same format as the Oppenheimer Data was originally provided to DocuLynx, irrespective of any claims by DocuLynx against Oppenheimer.

*Id.* at ¶ 10.

39. As such, like the Master Agreement and Amended Agreement underlying the parties' original business relationship, the Settlement Agreement made clear that under no circumstances (including failure by Oppenheimer to make payment) could DocuLynx or the Escrow Agent refuse to return the Oppenheimer Property.

40. Indeed, the Settlement Agreement further makes clear that any such refusal to return the Oppenheimer Property would cause Oppenheimer to suffer irreparable harm and entitle Oppenheimer to injunctive relief. *Id.* at ¶ 11.

41. The second condition precedent that DocuLynx was required to meet prior to being entitled to payment of an Annual Installment was the procurement of a performance bond. To this end, the Settlement Agreement provides:

> Prior to being entitled to receive any Annual Installment, DocuLynx shall provide Oppenheimer with written confirmation that DocuLynx's performance under said Annual Installment has been fully bonded and that should DocuLynx cease providing services to Oppenheimer for any reason, ***Oppenheimer shall immediately be entitled to the return of the prorated portion of the respective Annual Installment…***

*Id.* at ¶ 15 (emphasis added).

42. In other words, the performance bond ensures that in the event that Oppenheimer paid DocuLynx for a year of performance and DocuLynx ceased providing services prior to the expiration of that year, Oppenheimer would not only be entitled to get its property back, but Oppenheimer would also receive, via the performance bond, the prorated portion of the Annual Installment which Oppenheimer paid, but which DocuLynx did not earn.

43. This protection afforded by the performance bond was necessary solely as a result of DocuLynx's insistence that the Settlement Agreement provide for annual licensing fees, as opposed to the monthly fees which Oppenheimer had paid to DocuLynx over the past seventeen years of their relationship.

**DocuLynx's Material Breach of the Settlement Agreement**

44. For several weeks after the execution of the Settlement Agreement and the discontinuance of the Underlying Action, Oppenheimer awaited receipt of the performance bond which DocuLynx was required to obtain, so that Oppenheimer could make payment to DocuLynx and gain access to its customer data, which had now been held hostage for months by DocuLynx.

45. During this time period, DocuLynx reported on numerous occasions that it was allegedly having difficulty obtaining the bond.

46. On or about November 9, 2017, DocuLynx provided Oppenheimer with a copy of an "Annually Renewable Performance Bond" issued by Sompo International (the "DocuLynx Bond") a copy of which annexed hereto as Exhibit E.

47. The DocuLynx Bond does not comply with the terms of the Settlement Agreement (which is specifically referenced within the DocuLynx Bond itself). To this end, the DocuLynx Bond provides:

10

> In the event of default by [DocuLynx], [Oppenheimer] shall deliver to Surety by certified mail, a written statement of the facts of such default...In the event of default, the Surety will have the right and opportunity, at its sole discretion, to: a) cure the default; b) assume the remainder of the Agreement and to perform or sublet same; c) or to tender to [Oppenheimer] funds sufficient to pay the cost of completion less the balance of the Agreement price up to an amount not to exceed the penal sum of the bond.

*See* DocuLynx Bond, Exhibit E annexed hereto at ¶ 3.

48. The DocuLynx Bond does not comply with the terms of the Settlement Agreement, as it does not unconditionally provide that in the event that DocuLynx should cease providing services to Oppenheimer, Oppenheimer will immediately be entitled to recover the prorated unearned portion of the respective Annual Installment paid to DocuLynx under the Settlement Agreement.

49. On November 15, 2017, pursuant to the terms of the Settlement Agreement, Oppenheimer provided DocuLynx with notice of its material breach of the Settlement Agreement and demanded that DocuLynx cure said breach within ten (10) days. A copy of the November 15, 2017 notice of default is annexed hereto as Exhibit F.

50. Despite due notice, DocuLynx has failed to cure its material breach by procuring a performance bond that is in compliance with the terms of the Settlement Agreement.

51. The Settlement Agreement provides that, in the event that DocuLynx should fail to cure any material breach of the Settlement Agreement within ten (10) days of notice of the breach, Oppenheimer shall be entitled to recover its costs associated with any successful action to enforce the terms of the Settlement Agreement, including but not limited to reasonable attorneys' fees. *See* Settlement Agreement, Exhibit D annexed hereto at ¶ 17.

52. Oppenheimer has been damaged, including suffering irreparable harm, as a result of DocuLynx's breach of the Settlement Agreement.

## CAUSES OF ACTION

### COUNT I
### (Breach of Contract)

53. Oppenheimer repeats and realleges each and every allegation set forth within Paragraphs 1 through 52 of this Complaint as if set forth in full herein.

54. Pursuant to the Settlement Agreement, prior to receiving any Annual Installment, DocuLynx was required to obtain a performance bond which provides that in the event that DocuLynx should cease providing services to Oppenheimer, Oppenheimer would immediately be entitled to a refund of the prorated unearned portion of the Annual Installment.

55. Oppenheimer has performed its obligations under the Settlement Agreement.

56. DocuLynx has materially breached the Settlement Agreement by, among other things: (i) failing to obtain the required performance bond; and (ii) refusing to return the Oppenheimer Property.

57. Oppenheimer has been damaged as a result of DocuLynx's breach of the Settlement Agreement in an amount to be determined at trial, but no less than $100,000.

### COUNT II
### (Conversion)

58. Oppenheimer repeats and realleges each and every allegation set forth within Paragraphs 1 through 57 of the Complaint as if set forth in full herein.

59. DocuLynx has wrongfully refused to return the Oppenheimer Property, to which it has no legal entitlement, and has therefore wrongfully converted the property of Oppenheimer.

60. As a result of Defendant DocuLynx's wrongful conversion of the Oppenheimer Property, Oppenheimer has been damaged in an amount to be determined at trial, but no less than $100,000.

## COUNT III
### (Replevin)

61. Oppenheimer repeats and realleges each and every allegation set forth within Paragraphs 1 through 60 of the Complaint as if set forth in full herein.

62. Oppenheimer is the true and sole owner of the Oppenheimer Property.

63. DocuLynx has improperly and unlawfully retained possession of the Oppenheimer Property without the consent of Oppenheimer.

64. Oppenheimer is entitled to regain possession of the Oppenheimer Property.

WHEREFORE, Plaintiff Oppenheimer & Co. Inc. demands judgement against Defendant DocuLynx, Inc., as successor-in-interest to Anacomp, Inc. as follows:

(i) Ordering Defendant DocuLynx to immediately return the Oppenheimer Property to Plaintiff Oppenheimer;

(ii) On Plaintiff's First Count against Defendant DocuLynx for Breach of Contract for an amount to be determined at trial, but no less than $100,000;

(iii) On Plaintiff's Second Count against Defendant for Conversion for an amount to be determined at trial, but no less than $100,000;

(iv) On Plaintiff's Third Count against Defendant for Replevin for an Order directing DocuLynx to immediately return the Oppenheimer Property as provided within the Settlement Agreement;

(v) Awarding Plaintiff recovery of its costs associated with this action, including but not limited to reasonable attorneys' fees; and

(vi) Awarding Plaintiff such further relief as this Court deems just and proper.

Dated: New York, New York
January 9, 2018

SATTERLEE STEPHENS LLP

By: _____
Michael J. McAllister
Michael H. Gibson
John I. Coster IV
230 Park Avenue, 11th Floor
New York, New York 10169
(212) 818-9200
*Attorneys for Plaintiff Oppenheimer & Co. Inc.*

14

2777047_1